## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

Jo A. PERINE,

        **Plaintiff,**

v.                                      **Civil Action No. 1:08cv176**
                                        **(The Honorable Irene M. Keeley)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. Procedural History

Jo A. Perine ("Plaintiff") filed applications for SSI and DIB on August 29, 2006 (R. 112-23). Plaintiff's applications were denied at the initial and reconsideration levels (R. 97-103). Plaintiff requested a hearing, which Administrative Law Judge Mark O'Hara ("ALJ") held on October 4, 2007, and at which Plaintiff, represented by Roger Foreman, and J. Herbert Paris, a Vocational Expert ("VE"), testified (R. 32-80). On October 25, 2007, the ALJ issued a decision finding Plaintiff was not disabled and could perform a limited range of light work (R. 18-31). Plaintiff filed

a request for review of the ALJ's decision, and, on July 8, 2008, the Appeals Council denied Plaintiff's request, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. Statement of Facts

Plaintiff was fifty-three years old at the time of the administrative hearing (R. 41). Plaintiff graduated from high school and obtained a Certified Nursing Assistant (CNA) license (R. 72, 529). Plaintiff's past relevant work was that of a CNA (R. 43).

On October 24, 2003, a x-ray was made of Plaintiff's left wrist due to complaints of pain. It was normal (R. 242).

On April 19, 2004, Plaintiff presented to Dr. Soriano with complaints of right shoulder pain (R. 241). An office note by Dr. Soriano, made on April 21, 2004, showed he prescribed Paxil, Glyburide, Lotrel, Synthroid, Avandia, and Vioxx to Plaintiff (R. 241).

On April 29, 2004, Plaintiff presented to Dr. Soriano with complaints of numbness in her right hand and a "knot" in her right wrist (R. 240).

On May 26, 2004, Plaintiff presented to Dr. Soriano with complaints of edema in her lower extremities and continued arthritis pain and joint stiffness (R. 240).

On June 30, 2004, Plaintiff was examined by Dr. Soriano for swelling of her feet and pain when she walked. She was diagnosed with osteoarthritis and prescribed Vioxx (R. 239).

Also on June 30, 2004, Plaintiff laboratory results for her blood work showed she was positive for rheumatoid arthritis (R 236).

On September 16, 2004, Plaintiff was admitted to Pocahontas Memorial Hospital for a urinary tract infection with e-coli. She was treated with intravenous antibiotics and Prednisone; she was hypoglycemic and was "placed on sliding scale insulin . . ." (R. 221). She was discharged on

September 19, 2004; instructed to maintain an 1,800 calorie per day diet; and prescribed Levaquin, Synthroid, Glyburide, Paxil, Lotrel, Avandia, Vioxx, Lasix, and Prednisone (R. 222).

In a letter to Plaintiff from the Joseph Lemmer, M.D., of the Lewis-Gale Clinic, dated December 14, 2004, Plaintiff was informed that an x-ray made of her "ankles show[ed] fairly large amount of fluid collection called an effusion and some bone spurring." Plaintiff's left foot x-ray showed "some degenerative or wear and tear changes." Dr. Lemmer noted Plaintiff's right ankle and foot x-ray showed "similar findings." Plaintiff's left knee x-ray showed "mild wear and tear changes." Dr. Lemmer opined Plaintiff's right knee x-ray showed "advanced osteoarthritis or wear and tear changes." Dr. Lemmer wrote that Plaintiff's blood work was "normal," except for a "mildly low sodium level, slightly elevated kidney function test called BUN, which [was] not of concern." Plaintiff's blood sugar was "quite high" which indicated "poor control of diabetes." He informed Plaintiff that her blood test for inflammation and rheumatoid arthritis showed elevated results and were indicative of rheumatoid arthritis. The letter read that the results of the "laboratory tests indicate[d] that [Plaintiff] [was] indeed suffering from inflammatory arthritis, most likely rheumatoid arthritis, and that [she] [had] significant wear and tear or osteoarthritic changes of the right knee." Dr. Lemmer recommended that Plaintiff continue with the prescribed medications (R. 227, 236).

The results of the Plaintiff's right knee x-ray, which was referenced in the above letter, showed advanced osteoarthritis; patellar deformity; and "mixed sclerotic and lucent changes proximal tibia" (R. 228).

On February 4, 2006, Plaintiff presented to the emergency department at Pocahontas Memorial Hospital with complaints of pain in her left shoulder (R. 499). Plaintiff reported she had

a "history of bursitis" in her left shoulder. Her radial pulses were palpable to her left wrist. Plaintiff could "wiggle" her fingers; however, she was unable to mover her left arm (R. 500). An x-ray of Plaintiff's left shoulder was normal (R. 508). Plaintiff was treated with Toradol (R. 504). She was provided an arm sling for her left arm (R. 499, 504). Plaintiff was released to home. She was prescribed Toradol and Anaprox. She was instructed to wear the sling for two to three days (R. 507). On April 6, 2006, Plaintiff presented to the emergency department at Pocahontas Memorial Hospital with complaints of bursitis of the right shoulder, right shoulder pain, limited movement in her right shoulder, and right wrist pain. Plaintiff stated her pain was at six on a scale of one-to-ten (R. 491). The x-ray of Plaintiff's right shoulder was normal (R. 235, 498). Plaintiff was diagnosed with exacerbation of rheumatoid arthritis. Upon discharge, Plaintiff was instructed to treat her pain with heat and Sulidac. She was advised to wear a sling and to rest (R. 496).

Plaintiff was admitted to Davis Memorial Hospital on August 17, 2006, for right knee sepsis (R. 243, 247). A partial medial meniscectomy and chondroplasty were performed (R. 243). A chest x-ray was made when Plaintiff was admitted; it was normal (R. 250). The post-operative diagnosis was for right knee infection, medial meniscus tear, and osteoarthritis (R. 246). Dr. Pavlovich noted that Plaintiff's diabetes was under poor control due to her being "noncompliant with medication and care" and that Plaintiff had treated her diabetes with diet and herbal remedies in the past. He prescribed an insulin sliding scale and low dose Amaryl (R. 245). Plaintiff was discharged on August 20, 2006. She was prescribed Vicodin and Augmentin (R. 244).

On September 6, 2006, Plaintiff presented to Heather Reesman, physician assistant to Dr. Pavlovich, for a follow-up examination of her postoperative knee surgery. Plaintiff reported she had pain when she ambulated. P.A. Reesman noted some swelling, but no erythema or warmth. She had

no calf tenderness; she was neurovascularly intact. Plaintiff could flex to "about 110" and "lack[ed] approximately 10 degrees of extension." Plaintiff did not agree to physical therapy. P.A. Reesman instructed Plaintiff on home exercises for range of motion and strength (R. 261).

On October 2, 2006, Tina Dahl Wagner, M.S., a state-agency psychologist, completed a Mental Status Examination of Plaintiff. Ms. Wagner noted Plaintiff lived with her twenty-three year old son and her father. Plaintiff was cooperative and her attitude was "serious." Plaintiff's gait and posture were observed to be "abnormal" by Ms. Wagner; she walked with a cane and limped due to "knee problems." Plaintiff had a driver's license, but a friend drove her to the evaluation (R. 255). Plaintiff reported to Ms. Wagner that she cared for her father, who had had two strokes (R. 256).

Plaintiff's chief complaints were rheumatoid arthritis, a "bad" knee, diabetes, high blood pressure, anxiety attacks, depression, nervousness, and "crying spells." Plaintiff stated the onset of her conditions was August 17, 2006; her symptoms interfered with her work on August 15, 2006; her disability date was September 11, 2006; and Plaintiff had not made any attempts to return to work. Plaintiff reported she was "sad on an intermittent basis." Plaintiff stated she "worrie[d] constantly." Plaintiff stated she experienced two or three panic attacks weekly. Plaintiff stated the symptoms of the panic attacks were nervousness, anxiety, fear, fast heartbeat, and the desire to "die." Plaintiff reported her sleep patterns were disturbed; she had to have noise in order to sleep. Plaintiff stated she felt hopeless and helpless. Plaintiff reported she ate when hungry; she said she had not lost weight due to "depression." Plaintiff experienced low energy, fatigue, and the desire to "sleep all the time." Plaintiff stated she experienced no paranoia, mania, hearing voices, and/or seeing things or people who were not there. Plaintiff reported she attempted suicide once when she was twenty-five years old but did not have any suicidal ideations at the time of the evaluation (R.

5

256). Plaintiff reported she had been hospitalized after the suicide attempt but not since (R. 257).

Plaintiff reported Dr. Soriano was her primary care physician. She stated she did not take any prescribed medications because she was "unable to afford" any. Plaintiff reported she had had two knee surgeries and her gallbladder removed. Plaintiff stated her "'joints locked up." Plaintiff stated she had been "hospitalized two to three times for rheumatoid arthritis." Plaintiff reported she smoked occasionally and drank alcoholic beverages occasionally. She stated she had never been arrested for driving under the influence or public intoxication. She had not been hospitalized for substance abuse. Plaintiff stated she graduated from high school; she failed the fifth and seventh grades. Plaintiff's prior work was that of a textile factory worker and CNA (R. 257).

Ms. Wagner's examination of Plaintiff's mental status showed the following results: attitude and behavior were motivated; speech was normal tones, clear and concise; she was oriented, times four; mood was depressed; affect was tearful; thought process was within normal limits; thought content showed no delusional thinking and no obsessive-compulsive behaviors; her perception showed no evidence of hallucinations or illusions; insight was fair; her psychomotor behavior was noted as "moderately retarded" based on her walking with a cane and limping "greatly"; judgment was within normal limits; she had no suicidal or homicidal ideations; her immediate memory, recent memory, and remote memory were within normal limits; concentration and persistence were within normal limits; her social functioning was within normal limits (R. 257-58).

As to her social functioning, Plaintiff reported to Ms. Wagner that friends visited her; she "spent . . . most of her time taking care of her father"; she grocery shopped for food; went to doctors' appointments; and intended to go out to lunch after the evaluation. Plaintiff reported her typical daily activities included the following: awoke at 10:00 a.m.; took "total[]" care of her father; washed the dishes; fed the dog; collected the mail; swept the house; did laundry; cooked; paid bills; and

grocery shopped. She groomed herself with no assistance (R. 258).

Ms. Wagner's diagnoses of Plaintiff were as follows: Axis I – depressive disorder, NOS, panic disorder without agoraphobia, and generalized anxiety disorder; Axis II – no diagnosis; Axis III – diabetes, knee problems, high blood pressure, anxiety, depression, and rheumatoid arthritis as reported by Plaintiff. Ms. Wagner based her diagnosis of depressive disorder, NOS, on Plaintiff's "depressed mood and tearful affect, mildly slow pace, mildly retarded psychomotor behavior, as well as [her] reporting intermittent sadness, feelings of hopelessness and helplessness, and sleep disturbances." She based her diagnosis of panic disorder on Plaintiff's statements that she experienced panic attacks two or three times weekly (R. 258). Ms. Wagner's diagnosis of generalized anxiety disorder was based on Plaintiff's reporting to her that she worried "constantly, especially at night when everyone goes to bed" and was unable to control her worry. Ms. Wagner opined that Plaintiff's prognosis was "fair" with appropriate medical and psychological treatment. Ms. Wagner found Plaintiff could manage her own finances (R. 259).

On October 5, 2006, Plaintiff was treated by Dr. Pavlovich for her right knee condition. Plaintiff reported her knee continued to swell but the "pain [had] improved somewhat." Dr. Pavlovich's examination of Plaintiff revealed "a large effusion" on her right knee and tenderness along the medial and lateral joint space. She had no instability. Dr. Pavlovich's assessment was for "knee internal derangement and osteoarthritis." Dr. Pavlovich injected Plaintiff's right knee with cortisone (R. 260).

On October 19, 2006, Dr. Kip Beard, a state-agency physician, completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were for rheumatoid arthritis, diabetes, and osteoarthritis. Plaintiff reported she had not medicated her diabetes for three years

because she could not afford the cost of the medicine. Plaintiff stated her blood sugars were in the 130-to-170 range; she had not been diagnosed with retinopathy, neuropathy, or nephropathy; and had no lower extremity ulcerations. Plaintiff reported she had been diagnosed with rheumatoid arthritis and osteoarthritis in 2004. Plaintiff stated she experienced constant pain in "all of the joints of the arms and legs including the hands, wrists, elbows, shoulders, hips, knees, ankles, and feet." Plaintiff reported she had tenderness in those joints, but no redness, warmth, or swelling. Plaintiff stated the tenderness she experienced was "made worse with gripping, pulling, lifting, walking, standing or walking on steps" (R. 263). Plaintiff reported her right knee "[gave] out on her and grinds." Plaintiff stated that, if she stands for fifteen to twenty minutes, she will have to hold something to support her if she is to continue to stand beyond that time range (R. 264). Plaintiff informed Dr. Beard that she had received an injection to her right knee and her shoulders and had had surgery on her right knee in August, 2006 (R. 263). Plaintiff reported she medicated with Vicodin and she had depression and anxiety (R. 264).

No medical records were made available for Dr. Beard's review during the examination. Dr. Beard's review of Plaintiff's pulmonary, cardiovascular, gastrointestinal, and neurological systems were normal (R. 264). Dr. Beard noted Plaintiff ambulated with a cane and had a "moderately severe, right limping gait." Dr. Beard observed Plaintiff had "difficulty ambulating without the use of the cane because of the right knee . . . ." Dr. Beard noted Plaintiff had a "moderate degree of difficulty arising from a seat and stepping up and down from the examination able [sic] and required some mild assistance in doing so." Plaintiff appeared comfortable when seated and supine. Plaintiff could speak understandably, "but required some increased conversational volume with frequent repeats due to apparent diminished hearing." Plaintiff stated she was prescribed hearing aids four years earlier. Plaintiff was five feet, three inches tall and weighed 184 pounds. Her blood

pressure was 142/86 (R. 265).

Dr. Beard found no "evidence of hypertensive or diabetic retinopathy"; her HEENT, neck, chest, abdomen, and extremity examinations produced normal results. He noted his examination of Plaintiff's cervical spine "revealed some mild pain and tenderness with flexion to 50 degrees and extension to 45 degrees with no spasm and normal motion otherwise" (R. 265). Dr. Beard's examination of Plaintiff's arms revealed "some pain with motion testing and tenderness without redness, warmth, or swelling" in Plaintiff's shoulders. Adduction was to 130 degrees and forward flexion was to 140 degrees with normal range of motion. Plaintiff's elbows and wrists were without pain, tenderness, warmth, redness, or swelling and her wrist ranges of motion were normal. Dr. Beard's examination of Plaintiff's hands "revealed some mild Bouchard's nodes." Tenderness of the "MCPs" of the right hand was observed. Plaintiff had tenderness "about the CMCs of both hands with some mild associated prominence, but no atrophy and no Heberden nodes." Plaintiff could make a fist, extend her fingers, and oppose her thumbs. Plaintiff's grip strength was "18, 18 and 20 kg of force on the right and 14, 10, and 14 kg of force on the left." Plaintiff could write with her dominant hand pick up coins with either hand (R. 266).

Plaintiff complained of moderately severe pain on motion testing of her right knee during Dr. Beard's examination. Her right knee was positive for tenderness, swelling, effusion, and moderate patellofemoral crepitus. Dr. Beard observed "some moderate genu valgus alignment of the right knee." Plaintiff's right knee flexion was "95 degrees; extension to 15 degrees." Plaintiff's left knee was positive for "some mild pain with motion testing" and "mild tenderness without redness, warmth, swelling, or effusion." Dr. Beard observed "some patellofemoral crepitus on the left side." Plaintiff's left knee flexion was to 130 degrees with normal extension." Plaintiff's ankle

and foot examinations were normal (R. 266).

Dr. Beard's examination of Plaintiff's lumbar spine "reveal[ed] some mild pain and tenderness, but no spasm with normal curvature." Plaintiff's flexion was to seventy degrees, with normal range of motion "otherwise." Plaintiff was unable to stand on her right leg due to knee pain. Plaintiff's seated and supine straight leg raising tests were ninety degrees, without complaints. Plaintiff had no hip pain or tenderness; she had normal hip range of motion. Neurologically, Plaintiff had "weakness at the right knee graded at 4/5." Plaintiff had no sensory loss or atrophy. Her deep tendon reflexes were 2+ in biceps and patellar and 1+ in triceps and Achilles. Plaintiff was unable to heel walk, toe walk, or squat "due to severe right knee pain" (R. 267).

Dr. Beard's impressions were for diabetes mellitus, type 2, by history; osteoarthritis; rheumatoid arthritis, by history; and "right knee internal derangement, status post surgery two times, with evidence of significant osteoarthritic change." Dr Beard noted that his examination of Plaintiff revealed "no appreciable evidence of rheumatoid arthritis, clinically. There [was] significant evidence of osteoarthritis, particularly at the right knee." He noted he did not "appreciate any definite end-organ damage" caused to Plaintiff by her diabetes. He again noted Plaintiff had diminished hearing (R. 267).

On November 1, 2006, Timothy Saar, Ph.D., a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff. Mr. Saar found Plaintiff had impairments, which were not severe; specifically affective disorders and anxiety-related disorders (R. 270). Mr. Saar found Plaintiff's affective disorder was depression, NOS; Plaintiff's anxiety-related disorder's symptoms were "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once

a week." Mr. Saar noted the medically determinable impairment was general anxiety disorder (R. 273, 275). Mr. Saar found Plaintiff had no restrictions of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. Mr. Saar found Plaintiff had never experienced an episode of decompensation (R. 280).

Also on November 1, 2006, Caroline Williams. M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Williams found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited. Dr. Williams reviewed Dr. Beard's findings to form these opinions (R. 285). Dr. Williams found Plaintiff could occasionally climb ramps and stairs and stoop. Dr. Williams found Plaintiff could never climb ladders, ropes, scaffolds; balance; kneel; crouch; or crawl (R. 286). Dr. Williams found Plaintiff had no manipulative, visual, or communicative limitations (R. 287-88). Dr. Williams found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. She found Plaintiff should avoid concentrated exposure to extreme cold, vibrations, and hazards (R. 288). Dr. Williams noted that Dr. Beard found no clinical evidence of rheumatoid arthritis; there was no "evidence in the file to support claimant's allegation" of diabetes; the was no chiropractic treatment, pain management, physical therapy, or rheumatologist evaluation found in the file; and Plaintiff's ADL's did "not appear to be as limited by physical impairments to the degree of which claimant alleges" because she was able to care for her father, wash dishes, do laundry, sweep the floor, care for pets, cook, maintain personal grooming, drive, pay her bills, read, watch television, walk seventy-five to one-hundred feet, and socialize on the phone. Dr. Williams reduced Plaintiff's

RFC to light, with postural and environmental limitations (R. 289).

On December 27, 2006, Debra Lilly, Ph.D., a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff. Ms. Lilly found Plaintiff's impairments, affective disorder and anxiety-related disorder were not severe (R. 301). Plaintiff's affective disorder was listed as depression (R. 304). Plaintiff's anxiety-related disorder was listed as panic disorder (R. 306). Ms. Lilly found Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Ms. Lilly opined Plaintiff had not experienced any episodes of decompensation (R. 311). Ms. Lilly noted Plaintiff submitted a list of her ADL's after the evaluation. Plaintiff informed Ms. Lilly that she "continue[d] to care for her father"; reported "limitations due to physical"; reported she experienced "concentration and memory problems"; managed her own finances; completed forms in her file; had no mental health treatment; and she treated her pain with medication (R. 315).

On January 15, 2007, a West Virginia Department of Health and Human Resources General Physical (Adult) was completed of Plaintiff by Dr. Sharp. Dr. Sharp noted Plaintiff was not under a doctor's care and she was seeking disability due to her right knee degeneration and osteoarthritis, rheumatoid arthritis, bursitis of her left shoulder, diabetes, hypertension, and depression and anxiety. (R. 329-30). Dr. Sharp noted Plaintiff had not been treated by him since November, 1996, and she was being examined to obtain a medical card. Dr. Sharp noted Plaintiff had diabetes and had not checked her blood sugar; had hypertension; and had hypothyroidism but had not medicated that condition because she could not afford the medication. Plaintiff informed Dr. Sharp she had depression and when she did "anything out of the ordinary[,] she ha[d] crying spells and [got] anxious." Plaintiff informed Dr. Sharp she had to quit her job as a CNA because she could not walk at work. Plaintiff stated her right knee had "bone on bone" and "advanced osteoarthritis" was now

in the left knee.  Plaintiff stated she was "getting arthritis [in her] shoulders" and "all over" (R. 514).

Plaintiff informed Dr. Sharp she experienced fatigue, insomnia, generalized weakness, changes in activity, and irritability.  His examination of Plaintiff revealed no chills, fever, malaise, night sweats, weight gain, weight loss, or lethargy.  Plaintiff reported she experienced headaches.  Dr. Sharp found Plaintiff was positive for dyspnea; she had no chest pain, palpations, or syncope.  Dr. Sharp found she was positive for reflux, indigestion, and heartburn.  Dr. Sharp's evaluation of Plaintiff showed she had dysuria.  Plaintiff reported feeling "anxious, irritable" and experiencing sleep disturbances (R. 514).  Dr. Sharp found Plaintiff was negative for back pain and myalgias.  She had moderate right knee pain, with limited range of motion, and mild left knee pain, with limited range of motion.  Plaintiff was positive for mild bilateral shoulder pain and stiffness with limited range of motion.  Dr. Sharp recommended Plaintiff be treated with cortisone shots in her knees and shoulders.  Plaintiff was prescribed Lotrel, Sulidac, Plendil, Glyburide, Avandia, and Paxil (R. 515).

On February 9, 2007, A. Rafael Gomez, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 318).  Dr. Gomez found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 319).  Dr. Gomez found Plaintiff could occasionally climb ramps and stairs, stoop, and crouch.  Dr. Gomez found Plaintiff could never climb ladders, ropes, scaffolds; balance; kneel; or crawl (R. 320).  Dr. Gomez found Plaintiff had no manipulative, visual, or communicative limitations (R. 321-22).  Dr. Gomez found Plaintiff's exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited; she should avoid concentrated exposure to vibration.  Plaintiff should avoid moderate

exposure to hazards (R. 322). Dr. Gomez found Plaintiff was capable of light work (R. 323).

On March 21, 2007, Plaintiff presented to Pocahontas Memorial Hospital with "acute mental status changes and varying level[s] of consciousness." A CT scan of Plaintiff's head revealed "no mass, bleed or stroke but did revel right sphenoid sinusitis." Plaintiff's "carotid ultrasound was normal with no significant atherosclerotic disease." Plaintiff's chest x-ray was normal. Plaintiff's echocardiogram was negative. Plaintiff's lumbar puncture showed aseptic meningitis. Plaintiff was transferred to the University of Virginia Health System for treatment of meningitis. At the time of transfer, Plaintiff was diagnosed with mental status changes; confusion; aseptic meningitis; sphenoid sinusitis; urinary tract infection; type II diabetes mellitus; hypothyroidism; allergic reaction to Vancomycin (rash); noncompliance with medical therapy; smoker; rheumatoid arthritis; osteoarthrosis; and hypertension (R. 332-33, 346, 347, 348, 349, 351). When Plaintiff was transferred to UVA – Charlottesville, she was "alert" and "verbal" (R. 334).

On March 22, 2007, Plaintiff was transferred and admitted to University of Virginia Health System for treatment of urinary tract infection and aseptic meningitis (R. 402, 368-489). Her gait was steady (R. 394-95). On March 23, 2007, Plaintiff was alert and oriented, times three. Her movement and sensation were intact in all four extremities. Her behavior and affect were appropriate. Her respiratory, cardiovascular, musculoskeletal, and gastrointestinal systems were normal (R. 392). Plaintiff was released on March 24, 2007. She was prescribed Actos, Levothyroine, Buspirone, aspirin, Esomeprazole, insulin/Glargine, Lancets, Oxymetazoline, Fluticasone, Fluconazole, Tramadol, and Amoxicillin (R. 368-69). She was instructed to use a glucometer to check her blood sugar four times per day (R. 368). Plaintiff was instructed to follow a heart-healthy diet, that included low salt and low sugar (R. 369).

On March 26, 2007, Plaintiff underwent a "complete two-dimension transthoracic echocardiogram" at North Central Cardiology. It showed normal left ventricular systolic function. Plaintiff's ejection fraction was 55% to 60%. ". . .[M]ild tricuspid regurgitation" was evident, without any "signs of pulmonary hypertension." There was no pericardial effusion. Plaintiff's aortic valve, triscuid valve, atria, right ventricle, and left ventricle were normal (R. 490).

On April 30, 2007, Plaintiff reported to Dr. Sharp that she had been hospitalized for aseptic meningitis for three days in May, 2007. Dr. Sharp noted Plaintiff's blood glucose home readings averaged 278. Plaintiff informed Dr. Sharp that she was being treated for a thyroid condition with medication. Dr. Sharp noted Plaintiff's hypertension was fairly controlled and her diabetes and hypothyroidism were sub-optimally controlled. His examination of Plaintiff revealed no chills, fever, malaise, night sweats, weight gain, weight loss, or lethargy. Plaintiff reported she experienced headaches. Dr. Sharp found Plaintiff was positive for dyspnea; she had no chest pain, palpations, or syncope. Dr. Sharp found she was positive for reflux, indigestion, and heartburn (R. 510). Dr. Sharp's evaluation of Plaintiff showed she had dysuria. Plaintiff reported feeling "anxious, irritable" and experiencing sleep disturbances and mood swings. Dr. Sharp Plaintiff was negative for back pain and myalgias. She had moderate right knee pain, with limited range of motion, and mild left knee pain, with limited range of motion. Plaintiff was positive for mild bilateral shoulder pain and stiffness, with limited range of motion. Dr. Sharp recommended Plaintiff be treated with cortisone shots in her knees and shoulders (R. 511).

Dr. Sharp found Plaintiff was alert, well nourished, well developed, and in moderate distress. Plaintiff's hearing was grossly intact, bilaterally. Dr. Sharp's examinations of Plaintiff's ears, nose, throat, neck, and respiratory system produced normal results. Plaintiff's thyroid was "questionably

enlarged" (R. 511). Plaintiff's cardiovascular, vascular, and abdomen systems were normal. Dr. Sharp's examination of Plaintiff's left shoulder revealed moderate tenderness with motion; her right shoulder had tenderness and mildly reduced range of motion. Plaintiff's right and left hands had decreased grip and were weak. Plaintiff's right knee was positive for tenderness, with severe pain with motion. Her left knee was positive for tenderness, with mildly reduced ROM. Plaintiff's extremities "appear[ed] normal." She had no edema or cyanosis. Dr. Sharp's examination of Plaintiff's neurological systems showed she was alert and oriented, times three; had grossly normal intellect; had no sensory loss; experienced no motor weakness; had a "steppage . . . unsteady gait"; had intact coordination; had normal fine motor skills; had normal deep tendon reflexes, which were preserved and symmetric and negative for Babinski; and all her other reflexes were normal. Dr. Sharp noted Plaintiff was anxious, with a depressed affect. He noted she was hyperactive, agitated, and paranoid. Dr. Sharp found Plaintiff had poor insight and mood swings (R. 512).

Dr. Sharp opined Plaintiff's diabetes was sub-optimally controlled; her benign hypertension was fairly controlled; her hypothyroidism "NOS" was sub-optimally controlled; her osteoarthrosis was chronic; and her neurotic depression was chronic. Dr. Sharp prescribed Actos, Ultram, Synthroid, Augmentin, Glucophage, Plendil, Lotrel, Sulidac, Glyburide, Avandia, and Paxil (R. 512).

On August 3, 2007, Dr. Sharp examined Plaintiff, who reported she had been an inpatient for four days at Pocahontas Memorial Hospital with a diagnosis of diabetic coma/trauma. Plaintiff reported to Dr. Sharp that the physician, who treated her during her hospital stay, told her that she had "high blood pressure and her sugar [was] out of control." Plaintiff informed Dr. Sharp that she had "been checking her sugar and BP and . . . they [had] been good." Plaintiff stated her son had

taken her to the hospital because she was unable "to get her right eye open." Plaintiff reported her hypertension was exacerbated by anxiety. She experienced "buzzing/noise in ears – chest pain – headache – shortness of breath – tiredness." Plaintiff reported managing her diabetes with oral medications, insulin, and finger stick testing. Plaintiff's average glucose level was 183. Plaintiff reported Dr. Soriano had prescribed hydrocodone, but it was "too strong" and made her do "wacky things" (R. 517).

Dr. Sharp noted he instructed Plaintiff to "go over all meds . . .[,] throw away not needed meds" and continue taking those medications which were needed to treat her conditions. Dr. Sharp opined Plaintiff's hypertension was fairly controlled; her diabetes was sub-optimally controlled; her depression was chronic; her osteoarthritis was chronic; and her hypothyroidism was chronic. Dr. Sharp found Plaintiff experienced headaches as a side-effect to her hypertension; fatigue was a result of her diabetes and hypothyroidism; and her ADL's are limited by osteoarthrosis. Dr. Sharp noted Plaintiff took her diabetes medications regularly and she was "check[ing] her sugar at home" (R. 517). Dr. Sharp's examination of Plaintiff's respiratory, cardiovascular, and vascular systems were normal. Plaintiff had no back pain or myalgias (R. 518). Plaintiff's eye, head, face, ears, nose, throat, neck, thyroid, and extremities were normal upon examination (R. 519). Plaintiff reported anxiety, irritability, mood swings, and sleep disturbances. Plaintiff was positive for abdominal pain, reflux, indigestion, heartburn, dysuria, urgency and headaches. Plaintiff was positive for moderate right knee pain and mild right knee pain. Both knees had limited ranges of motion. Plaintiff was positive for moderate bilateral shoulder pain, with stiffness and mildly limited range of motion (R. 518). Plaintiff had bilateral hand weakness and reduced grip. Plaintiff was alert and oriented, times three. Her memory, cranial nerves, and coordination were intact. She had no sensory loss or motor

weakness. Her fine motor skills and reflexes were normal. Her gait was unsteady. Plaintiff was positive for anxiety, depressed affect, hyperactive, mood swings, agitation, and poor insight (R. 519). Dr. Sharp prescribed Nexium, Ultram, Augmentin, glucophage, Buspirone, Plendil, Cefuroxime Axetil, Levothyroxine Sodium, Lisinopril, Sulidac, Glyburide, Avandia, Paxil, and Lotrel (R. 519-20). He recommended Plaintiff do back exercises and follow a walking program (R. 520).

Also on August 3, 2007, Dr. Sharp completed a Residual Functional Capacities Form of Plaintiff. He noted he'd been treating Plaintiff every two-to-three months for years. He had diagnosed her with uncontrolled, insulin-dependent diabetes; hypothyroidism; GERD; depression; hypertension; chronic panic attacks; sinusitis; and arthritis. He listed her symptoms as depression, dizziness, fatigue, headaches, and pain. Dr. Sharp described Plaintiff's pain as mild arthritis pain and pain in her knees and feet. Dr. Sharp listed "stiff joints," "mental status," "review LAB," and "hospital reports" as the clinical findings and objective signs to support his findings (R. 521).

Dr. Sharp opined Plaintiff's impairments lasted or he expected them to last for at least twelve months. Dr. Sharp opined Plaintiff was not a malingerer and that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations (R. 521). Dr. Sharp noted Plaintiff's impairments were consistent with the symptoms and functional limitations described in the evaluation. Dr. Sharp opined Plaintiff's arthritis pain would frequently interfere with her attention and concentration. Dr. Sharp found Plaintiff was incapable of tolerating "even 'low stress.'" As to Plaintiff's functional limitations, Dr. Sharp found Plaintiff could walk one-half city block before she had to rest or developed pain. Plaintiff could sit for forty-five minutes before needing to get up and move around. Plaintiff could stand for fifteen minutes before needing to sit down or stretch (R.

522).  Plaintiff could sit for about two hours or four hours in an eight-hour work day; she could stand and/or walk for less than two hours in an eight-hour workday.  Dr. Sharp found Plaintiff would need to lie down every hour for ten minutes during an eight-hour work day.  Plaintiff would require a job that permitted shifting positions at will and unscheduled breaks.  Dr. Sharp found Plaintiff's legs would not require elevation after prolonged sitting (R. 523).  Dr. Sharp did not offer an opinion as to how many unscheduled breaks Plaintiff would need to take during the course of a work day; he did not offer an opinion as to whether Plaintiff required the use of an assistive device for ambulation.  Dr. Sharp found Plaintiff could never lift fifty pounds; could rarely lift ten to twenty pounds; and could occasionally lift less than ten pounds.  Dr. Sharp opined Plaintiff could rarely climb ladders and could occasionally twist, stoop, bend, crouch, and climb stairs.  Dr. Sharp found Plaintiff had limitations in her ability to repetitively reach; specifically, Dr. Sharp found Plaintiff's fingers' fine manipulations and arms' reaching were limited as to grasping, turning, and twisting objects.  Dr. Sharp did not assign a percentage of time during an eight-hour workday that Plaintiff could perform repetitive tasks with her fingers and arms.  Dr. Sharp found Plaintiff's limitations caused "good days" and "bad days" because she could not "get in/out bath tub" (R. 524).

Dr. Sharp described the following "other limitations" that applied to Plaintiff: diabetes that was not under "good control" and "depressed/anxiety – stress – panic attacks" (R. 525).

On September 25, 2007, Sheila V. Rose, M.S., a licensed psychologist, completed a Psychological Evaluation of Plaintiff.  Ms. Rose reviewed Plaintiff's school records and the clinical interview and mental status examination reports completed by Ms. Wagner on October 2, 2006, in which Plaintiff was found to have depressive disorder, NOS, panic disorder without agoraphobia, and generalized anxiety disorder (R. 527).

Ms. Rose noted Plaintiff "arrived for her evaluation thirty minutes late . . . , alone and almost in tears. She was out of breath, and stated that she had left her house at 8:30 a.m., hoping to catch a ride. She reported that she had difficulty getting a ride, [sic] and walked 1.5 miles before someone offered to bring her into town." Plaintiff walked with a cane and was "very shaky." "Her knee was kept straight for most of the evaluation" (R. 527). Plaintiff's "tremors worsened whenever she was upset" (R. 527-28). Ms. Rose noted Plaintiff appeared "very childlike, "at times," in the interview and "frequently apologized for her state as she broke into tears" (R. 528).

Plaintiff informed Ms. Rose that she had applied for disability "due to a number of physical and mental difficulties." She reported having had two surgeries on her right knee and having been diagnosed with rheumatoid arthritis, bursitis and osteoarthritis. Plaintiff stated she had "severe pain in her joints" and could not "do any lifting" (R. 528).

Plaintiff reported she lived with her eighty-four year old father and her twenty-four year old son. Plaintiff reported her mother died when she was young and her father, due to his heavy drinking, could not rear her and her siblings. She was adopted by her aunt and uncle. Plaintiff reported that her father sexually abused her shortly after the death of her mother and that he and her grandfather continued to sexually molest her. Plaintiff stated she felt responsible for these incidents. Plaintiff stated she felt guilty because she had given birth to a child when she was a teenager and had given it up for adoption. Plaintiff stated her adoptive parents did not allow her to continue to live with them when she became pregnant, and she married her husband as a way to "deal with her homelessness." Plaintiff and her first husband divorced, and Plaintiff became pregnant by "another boyfriend" with her son. The boyfriend left Plaintiff and her son when the son was two weeks old (R. 528).

Plaintiff informed Ms. Rose she had also been diagnosed with asthma, "thyroid problems," diabetes, allergies and sinus pain, hypertension, and being overweight. Plaintiff reported she had been hospitalized for her two knee surgeries, spinal meningitis, gallbladder surgery, and "joints locking up." Plaintiff reported she medicated with Actos, Lisinopril, Lantos, Nexium, Humulin, Buspirone, Levothyroxine, and Tramadol (R. 529).

Plaintiff reported she had attempted to commit suicide as a teenager after having lost a job. She had been treated by a psychiatrist "for a time following the incident." Plaintiff reported she had recently been prescribed "'nerve pills,'" but had not "yet filled the prescription" (R. 529).

Upon examination, Plaintiff's speech was "pressured and broken due to breathlessness and anxiety"; her comprehension was within normal limits; Plaintiff's reasoning abilities were within normal limits; her immediate, recent, and remote memories were within normal limits; Plaintiff's concentration was within normal limits; her affect was tearful; her mood was depressed and anxious; Plaintiff's thought processes and content were within normal limits; her perception was within normal limits; Plaintiff's insight was poor; her judgment was within normal limits; Plaintiff's psychomotor behavior was positive for tremors; her persistence was poor; Plaintiff's social functioning, during the evaluation, was moderately impaired (R. 530).

Ms. Rose opined Plaintiff "exhibit[ed] the symptoms of Post-traumatic Stress Disorder" in that she experienced "flashbacks and intrusive memories of her sexual abuse"; was hypervigilant; panicked "upon exposure to triggers of memories"; attempted to avoid thoughts and situations that remind[ed] her of the abuse"; and had increased "arousal symptoms." Ms. Rose opined that Plaintiff's concentration, anger, and sleep were "all disturbed." Ms. Rose noted Plaintiff had had these symptoms for "longer than six months." Ms. Rose also opined that Plaintiff was "suffering

from depression." Her symptoms were she had "no interest in activities"; did not "experience joy"; had gained weight; could not sleep; was agitated; felt "worthless and guilty"; had difficulty concentrating; "had difficulty with suicidal thoughts"; and "possibly" had a "dissociative episode." Ms. Rose noted Plaintiff had stated that she had been "going around the house with a teddy bear, [sic] and had pills and scissors taken away from her by her father and her son." Ms. Rose also noted that there was "[n]ot enough information . . . present to justify a dissociative diagnosis at [the] time, but major depression [was] definitely present" (R. 530).

Ms. Rose's diagnoses were as follows: Axis I – post traumatic stress disorder, chronic; major depressive disorder, severe, recurrent; sexual abuse; Axis II – no diagnosis; Axis III – rheumatoid arthritis, osteoarthritis, thyroid problems, diabetes, asthma, allergies, sinus, hypertension, gall bladder surgery, by history. Ms. Rose's prognosis for Plaintiff was as follows: "[p]oor; poor insight and in need of treatment, as well as needs to separate from father" (R. 530). Ms. Rose found Plaintiff was "not able to manage funds should" funds be awarded (R. 531).

Ms. Rose completed a Mental Impairment Questionnaire of Plaintiff on October 1, 2007. Ms. Rose did not offer an opinion as to Plaintiff's abilities in the "Understanding and Memory" category (R. 532-33). In the category of "Sustained Concentration and Persistence," Ms. Rose did not offer an opinion as to Plaintiff's limitations relative to her ability to carry out very simple instructions; ability to carry out detailed instructions; ability to maintain attention for extended periods; and ability to sustain an ordinary routine without supervision. Ms. Rose found Plaintiff was markedly limited in her ability to maintain regular attendance and be punctual within customary tolerances; markedly limited in her ability to work in coordination or proximity to others without being unduly distracted by them; slightly limited in her ability to make simple, work-related

decisions; markedly limited in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms; and markedly limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. In the "Social Interaction" category, Ms. Rose did not make any findings as to Plaintiff's ability to ask simple questions or request assistance, her ability to maintain socially appropriate behavior, or her ability to adhere to basic standards of neatness and cleanliness. She found Plaintiff was markedly limited in her ability to interact appropriately with the general public; markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors; and moderately limited in her ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes (R. 533). In the category of "Adaptation," Ms. Rose did not offer an opinion as to Plaintiff's ability to respond appropriately to changes in a routine work setting. She found Plaintiff was slightly limited in her ability to be aware of normal hazards and take appropriate precaution; moderately limited in her ability to travel in unfamiliar places or use public transportation; and moderately limited in her ability to set realistic goals or make plans independently of others (R. 534).

Ms. Rose opined Plaintiff's impairments lasted, or were expected to last, twelve months. Ms. Rose found Plaintiff's psychiatric conditions could reasonably be expected to exacerbate any pain caused by her physical conditions. Ms. Rose noted Plaintiff's "anxiety level [had] extremely negative effects on her blood pressure, diabetes, and asthma." Additionally, Ms. Rose opined Plaintiff was "experiencing recurrent panic attacks related primarily to her abuse history. She react[ed] to normal social events with fear. She also [had] no self esteem, [sic] and cannot tolerate negative feedback" (R. 534).

<u>Administrative Hearing</u>

At the administrative hearing, which was conducted on October 4, 2007, Plaintiff testified she no longer worked because she could not "move around" as she had in the past; she could not stand on her leg; she could not stand on her feet; she could not walk as she once was able to walk; she became "confused"; she "never [knew] when [her] sugar [was] going to drop"; and she had panic attacks (R. 41, 42, 43). Plaintiff's counsel observed that Plaintiff's body was "shaking . . . below the table" as she testified; Plaintiff stated she was "frequently that way" when she was in an unfamiliar place (R. 42).

Plaintiff stated she had pain in her knees, ankles, feet, shoulders, elbows, wrists, and fingers. Plaintiff stated her left knee would "fly out of place and go back in," which caused her to fall (R. 43). Plaintiff stated she had fallen "about a month ago" when she was in the garden, picking beans. Plaintiff stated she treated her hand pain by putting them in "hot water" in order to make her fingers move (R. 44). Plaintiff testified she could not lift or make a "tight fist" due to her hand pain (R. 44-45). Plaintiff stated she had no strength in her hands; she dropped things she attempted to hold. Plaintiff stated she could not cut meat with eating utensils; she had to "tear it with [her] fingers" because she lacked hand strength (R. 45).

Plaintiff stated she used the cane to ambulate when she was outside "mostly." Plaintiff used "things . . . in the house" on which to hold when she walked inside (R. 46). Plaintiff stated the cane was not prescribed for her use (R. 69).

Plaintiff testified she had two or three panic attacks per week (R. 48). Plaintiff stated she shook, was confused, and cried when she had panic attacks. Plaintiff testified her panic attacks lasted until her son could "calm [her] down or she took a "nerve pill and [went] to sleep" (R. 49).

Plaintiff testified her diabetes caused her blood sugar to rise or drop and that she

"panic[ked]" when it did either (R. 51).  Plaintiff stated her blood sugar rose or fell "three or four

times a week."  Plaintiff testified she monitored her blood sugar "about four times a day" (R. 52).

Plaintiff testified she had been hospitalized for diabetes in August (R. 67).

Plaintiff testified she took medications to treat her pain (R. 49).   Plaintiff stated she had

received an injection for treatment of her bursitis (R. 67).  Plaintiff stated she took "four shots a day

plus one pill" to treat her diabetes (R. 51).  Plaintiff testified she "tr[ied] to eat right" and to "drink

diabetic beverages" to control her diabetes (R. 51-52).

Plaintiff testified she cared for her father.  She cooked for him, gave him his medications,

and helped him dress occasionally.  Plaintiff stated her son "sometimes" helped her care for her

father (R. 46).  Plaintiff testified she occasionally helped her father in and out of the bathtub.  She

stated she grocery shopped for her father, paid his bills, and read his mail to him (R. 63).  Plaintiff

stated she awoke "about . . . 9:30 [a.m.] or 10:00 [a.m.], something like that"; prepared her father

some food; washed the dishes; went to the mailbox; fed the dogs; prepared dinner, which was

"something quick and easy" (R. 48).  Plaintiff testified she could get into the bathtub but needed

assistance in getting out of the tub (R. 50).  Plaintiff testified she was "able to go to the store and

shop," but she "always [had] to have somebody with" her because she sometimes had panic attacks

and became confused in the supermarket (R. 52).  Plaintiff testified she no longer attended church

because she was "afraid of having a panic attack" and that her blood "sugar . . . [would] drop" (R.

53).  Plaintiff testified she could drive a car and did drive to the grocery store, which was ten miles

away (R. 60).  Plaintiff stated she read, watched television, drew pictures, and did "word search"

puzzles (R. 61-62).

Plaintiff testified she had good and bad days.  She stated that, on a good day, she could "bake

a cake," but "that's about all [she] [could] get done" and that she could "move around a little bit better" (R. 55). Plaintiff stated that she occasionally did not "get up and get dressed" because she was "real stiff and sore" and could not "hardly move" (R. 55).

The ALJ asked the VE the following hypothetical question:

Well, let's assume you're dealing with a person who can do light work. That is lift/carry 20 pounds occasionally, 10 pounds frequently. Stand/walk about six hours in an eight hour day. Sit about six hours in an eight hour day. Push/pull unlimited, except for the lifting and carrying. No climbing ladders. No balancing. No kneeling. No crouching. No crawling. Climbing stairs and ramps or stooping, occasionally. . . . No postural activities except for occasional stooping – climbing stairs or ramps (R. 73). . . . And we-re avoiding concentrated exposure to extreme cold and vibration. And we're avoiding even moderate exposure to hazards, such as moving machinery parts or unprotected heights. . . . [I]f we further assume that the person is the same age as the claimant, has the same educational background, and past work experience, could such a person do other jobs that exist in significant numbers in the national or national economy? (R. 74).

The VE responded as follows:

Yes, sir. She could do the work as a silver wrapper. There's some 100,000 of those jobs in the national economy and just under 3,000 within the region, with the region being West Virginia and Virginia. She could do one of the inspector positions. There's more than 146,000 nationally and more than 4,100 of those within the region. She could do the work of a hand packager. Some 215,000 of those nationally . . . and within the region, some 5,5000 (R. 74).

The ALJ then asked the VE the following:

Assume we're dealing with a modified light, lift/carry 20 pounds occasionally, 10 pounds frequently. Stand or walk up to four hours in an eight hour day. Sit about six hours in an eight hour day. Push/pull unlimited, except for the lifting and carrying restriction. Again, only occasional climbing stairs and ramps. Occasional stooping. We are avoiding the other postural activities. And we are avoiding concentrated exposure to extreme cold and vibration and we're avoiding even moderate exposure to hazards. Again, this person could not do, because we're at the modified light, could not do the claimant's past work. But if we further assume that the person is the same age as the claimant, has the same educational background and past work experience, could such a person do other jobs that exist in significant numbers in the regional and national economy at the light exertional level (R. 75-76).

The VE responded as follows:

As far as the jobs that were mentioned, I don't see any there that would give us a problem within those, within that. . . . There are essentially no posturals involved with those (R. 76).

The ALJ asked the VE if the jobs "accommodate[d] a sit/stand option?" (R. 76).

The VE responded:

Yes, sir. And for the most part, it's what we're really talking about more than anything is the weight that would put it into the level three. Though you're still, I wouldn't want just to say that is all that's involved, but the weight plays a major factor in that. They are confined to an area. You can't walk around. You're there doing the work (R. 76).

The ALJ then asked:

[I]f your understanding of this individual, the same age, education, and experience of the claimant were reduced to sedentary work with no transferable skills at sedentary, that person would be found disabled under the grid rule? (R. 76-77).

The VE responded in the affirmative (R. 77).

Plaintiff's counsel asked the VE the following question:

Assume that person has problems . . . with grasping, fine manipulation, and reaching, . . . [a]nd also handling and fingering. Would that [sic] have a problem with those jobs that you've listed? (R. 77).

The VE stated that "all of these jobs do require use of hands. . . . and so to the extend that you have problems that it would interfere with your ability to do the work, then, then . . . that's going to affect all of those jobs (R. 77).

Counsel asked:

So if there was [sic] problems with grasping and hand manipulation, such that things were dropped, would it be fair to say that that's a major part of those jobs and she could not perform those jobs? (R. 77). If you don't have full grip strength and you drop things (R. 78).

The VE responded: "If you can't lift 20 pounds and handle it during a period of time, 10 to 20 pounds, then yes, you're going to have problems doing that (R. 78).

Counsel asked the VE the following:

Assuming, removing that from the hypothetical and taking the hypothetical as given to you, number two, and adding to it the diagnoses of post traumatic stress disorder, chronic major depressive disorder, severe/recurrent, with markedly limited restriction on the ability to maintain regular attendance and be punctual within customary tolerances. How would that affect the jobs you've identified? (R. 78).

The VE stated:

If you . . . can't go to work when expected to go to work and perform during the entire day, then yes, you're not going to be able to hold employment. I think it's something like a day a month is the max you can get along with and still maintain employment. If it becomes more than that, then . . . yes, you're not going to be able to do that (R. 78).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ O'Hara made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011 (Exhibit 3D) (R. 20).

2.  The clamant has not engaged in substantial gainful activity since August 25, 2006, her alleged onset date (Exhibit 3D and testimony)(20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*)(R. 20).

3.  The claimant has osteoarthritis of the knees and osteoarthritis of the ankles, which are severe impairments (20 CFR 404.1520(c) and 416.920(c)) (R. 21).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 23).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of unskilled light work. Specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand/walk for approximately up to 4 hours in an 8-hour workday, can sit for about 6 hours in an 8-hour workday, and can push and pull up to 20 pounds occasionally and 10 pounds frequently with her upper and lower extremities. However, she cannot

perform any climbing of ladders/ropes/scaffolds, balancing, kneeling, crouching or crawling; is limited to occasional climbing of stairs/ramps and stooping; must avoid concentrated exposure to extreme cold and vibration; and must avoid even moderate exposure to workplace hazards, such as moving machinery and unprotected heights (R. 23-24).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (R. 29).

7.     The claimant was born on December 11, 1953. She was 52 years old on her alleged disability onset date and is currently 53 years old. At all points relevant to this decision, she has been an individual closely approaching advanced age (20 CFR 404.1563 and 416.963) (R. 29).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 29).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 29).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) (R. 29).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 30).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.      The ALJ erred in his failure to consider and weigh all the evidence.

2.      The Commissioner erred in relying on an ALJ decision which failed to find the following as severe impairments: arthritis of hands and shoulders, diabetes mellitus, and mental impairments.

3.      The Commissioner erred in relying on the ALJ's use of evidence outside the record in this case to discredit the opinion of the treating physician.

4.      The Commissioner erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question.[1]

The Commissioner contends:

1.      The ALJ appropriately weighed the medical evidence.

---

[1]Plaintiff, in her brief, lists her fourth contention as number five. There is no contention numbered as four. Plaintiff asserts a total of four, not five, contentions.

2.      The ALJ's severity finding is supported by substantial evidence.

3.      The ALJ did not rely upon evidence outside the record to discredit the opinion of the treating physician.

4.      The ALJ's hypothetical question was appropriate.

### C.  Evidence not Considered

Plaintiff contends the ALJ erred in his failure to consider and weigh all the evidence in that he did not analyze or consider the opinion of Dr. Lemmer, who found Plaintiff "suffered from rheumatoid arthritis" (Plaintiff's brief at pp. 8-9).  Defendant contends the ALJ appropriately weighed the medical evidence as to Plaintiff's diagnosis of rheumatoid arthritis in that he "implicitly considered it when he accepted the finding that there was no clinical evidence of rheumatoid arthritis during Dr. Beard's examination" (Defendant's brief at p. 11).

The ALJ, in his decision, evaluated the evidence as to Plaintiff's osteoarthritis of the knees and ankles, which he found severe, and hypertension, depression, panic disorder, generalized anxiety disorder, and diabetes, which he considered as  medically determinable impairments (R. 21–23). The ALJ did not discuss or consider rheumatoid arthritis in his decision.  He did not evaluate or weigh the opinion and findings of Dr. Lemmer, the rheumatologist who diagnosed Plaintiff with "inflammatory arthritis," which he found to be "most likely rheumatoid arthritis" (R. 227).

20 C.F.R. §404.1527(d)  mandates, in part, the following: ". . .  *How we weigh medical evidence*.  Regardless of its source, we will evaluate every medical opinion we receive. . . ."

On December 14, 2004, Dr. Lemmer wrote that Plaintiff's blood test for inflammation and rheumatoid arthritis showed elevated results and indicative of rheumatoid arthritis.  Specifically, Dr. Lemmer opined that the "laboratory tests indicate[d] that [Plaintiff] [was] indeed suffering from inflammatory arthritis, most likely rheumatoid arthritis . . ." (R. 227, 236).  Additionally, the record

of evidence contains the results of Plaintiff's June 30, 2004, laboratory testing, which were "positive" for rheumatoid arthritis (R. 236).

As argued by the Plaintiff, the ALJ did not acknowledge, in his decision, that this diagnosis had been made; he did not discuss, consider, or weigh Dr. Lemmer's opinion; and he did not consider or evaluate the results of the laboratory testing relative to Plaintiff's rheumatoid arthritis. Had the ALJ reviewed the opinion of Dr. Lemmer, a determination should have made by the ALJ as to whether the impairment is medically determinable or severe and what impact, if any, that impairment had on Plaintiff's ability to function. 42 U.S.C. §§ 423(d)(2)(B) and 1382(c)(a)(3)(F) provide the following:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be a basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does not find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

Because the ALJ failed to evaluate and weigh the evidence as to Plaintiff's diagnosis of rheumatoid arthritis, he failed to complete a proper and complete analysis of Plaintiff's impairments and resulting limitations, if any.

As noted by Defendant, the ALJ did consider Dr. Beard's October, 2006, findings that Plaintiff "had no appreciable evidence of rheumatoid arthritis" (R. 26). Dr. Beard found, in the text of his written report of his examination of Plaintiff, there was no "appreciable evidence of rheumatoid arthritis, clinically"; however, Dr. Beard also noted he reviewed no medical records in completion of his examination of Plaintiff and the resulting report (R. 264, 267). He did not review the medical opinion of Dr. Lemmer or the results of the laboratory testing that Plaintiff was positive

of rheumatoid arthritis.

The ALJ in this case did not evaluate "every medical opinion" available to him; specifically, he did not evaluate the December, 2004, diagnosis of Dr. Lemmer and the June 30, 2004, laboratory results that Plaintiff was positive for rheumatoid arthritis. His decision, therefore, is not supported by substantial evidence.

### D. Severe Impairments

Plaintiff contends the Commissioner erred in relying on the ALJ's decision, which failed to find Plaintiff's arthritis of hands and shoulders, diabetes mellitus, and mental impairments were severe. Defendant asserts the ALJ's severity finding is supported by substantial evidence.

20 C.F.R. §§ 404.1521 holds the following:

(a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitude necessary to do most jobs.  Examples of these include –

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

33

In his decision, the ALJ found the following:

The medical evidence of record reveals that the claimant experiences pain, tenderness and decreased range of motion in her knees and ankles due to mild osteoarthritis of the left knee, advanced osteoarthritis in the right knee, patellar deformity in the right knee, and mixed sclerotic and lucent changes in the proximal tibia of the right leg. These impairments, at least in combination, are severe because they limit her mobility, ability to lift and carry heavy objects and her ability to perform postural activities (R. 21).

The medical evidence also reveals that the claimant has been diagnosed with hypertension, diabetes, a generalized anxiety disorder, a panic disorder with agoraphobia, and depression. However, she has been non-compliant with treatment for her diabetes as she has not taken her medications on a regular basis (Exhibits 6F, 10F, 25F, 22F). In addition, there is no evidence of any end organ damage as a result of her hypertension or diabetes. Consequently, the undersigned finds that her diabetes and hypertension are non-severe since they have not resulted in any continuous exertional or non-exertional limitations (R. 21).

. . . [T]he undersigned finds that the claimant's mental impairments are non-severe. She has not received any mental health treatment for her impairments since her alleged onset date, and while she was prescribed Paxil by her primary care in January 2007, she admitted in August 2007 that she had not had her prescription filled. Clearly if she were suffering from debilitating mental impairments, she would have received some treatment from a mental health professional and would be taking prescription medications. This lack of treatment undermines her credibility considerably (R. 22).

As noted above in the recounting of the ALJ's decision, he did not analyze or consider

Plaintiff's shoulder and hand pain. The ALJ did acknowledge, in his assessment of certain medical

records, that Plaintiff experienced pain in her hands and shoulders. He mentioned Plaintiff's

testimony that she experienced pain in her shoulders and fingers (R. 25). He noted Dr. Beard's

examination of Plaintiff showed mild pain and tenderness in her shoulders with range of motion

testing, and her shoulder ranges of motion were mildly reduced (R. 26). The ALJ also noted some

of the findings by Dr. Sharp. In January, 2007, he found that Plaintiff experienced bilateral shoulder

pain and decreased ranges of motion in her shoulders. In April, 2007, he found that Plaintiff had

"tenderness in her right and left shoulders, moderate pain with range of motion in her left shoulder, and mildly reduced range of motion in the right shoulder," In August, 2007, Dr. Sharp found that Plaintiff had "tenderness in her right and left shoulders, moderate pain with range of motion in her left shoulder, and mildly reduced range of motion in the right shoulder" as well as "decreased grip strength in both hands" (R. 26, 27).

The record of evidence contains additional information about the pain in Plaintiff's shoulders and hands. As early as April, 2004, Plaintiff complained of right shoulder pain to Dr. Soriano. He prescribed Vioxx for treatment of that pain (R. 241). Also in April, 2004, Plaintiff complained of numbness in her right hand to Dr. Soriano (R. 240). Plaintiff also informed Dr. Soriano that she experienced joint stiffness and continued arthritis pain (R. 240). As noted earlier in this document, in December, 2004, Plaintiff was diagnosed with "inflammatory arthritis, most likely rheumatoid arthritis" due to her laboratory testing being positive for rheumatoid arthritis (R. 226, 236). Plaintiff was treated at the Pocahontas Memorial Hospital for left shoulder pain on February 4, 2006. She was unable to move her arm. She was medicated with Toradol and Anaprox (R. 499, 500, 507). Plaintiff again presented to the emergency department of Pocahontas Memorial Hospital on April 6, 2006, with complaints of right should pain and limited movement in her right shoulder. She also complained of right wrist pain during this hospital visit. She was treated with Sulidac and heat. She was instructed to wear a sling on her right arm/shoulder (R. 491, 496).

Even though the ALJ considered the opinions and findings of Dr. Beard, he did not mention that, during her evaluation with Dr. Beard, Plaintiff stated she experienced constant pain in "all of the joints of the arms and legs including the hands, wrists, elbows, shoulders, hips, knees, ankles, and feet." Plaintiff stated she also experienced tenderness in all those areas. Plaintiff informed Dr.

Beard that the tenderness was "made worse with gripping, pulling, lifting, . . ." (R. 263). Dr. Beard found Plaintiff experienced "some pain with motion testing and tenderness . . ." in her shoulders. Dr. Beard's opined Plaintiff had "mild Bouchard's nodes" in her hands. She had tenderness of her metacarpophalangeal joint of her right hand. Plaintiff was diagnosed with tenderness of the carpometacarpal joint of both hands with associated mild prominence. Dr. Beard also found Plaintiff's grip strength was 18, 18, and 20 kg of force on the right and 14, 10, and 14 kg of force on the left (R. 26). Likewise, the ALJ did not note that Dr. Sharp found Plaintiff had reduced grip in her hands and that she experienced hand weakness when she was examined by him in April, 2007, and that she had limitations in her ability to repetitively reach and that her fine manipulations and arm movements were limited as to grasping, turning, and twisting objects (R. 512, 524).

At the administrative hearing, Plaintiff testified that she treated her hand pain by putting them in "hot water" in order to make her fingers move (R. 44). Plaintiff testified she could not lift or make a "tight fist" due to her hand pain (R. 44-45). Plaintiff stated she had no strength in her hands; she dropped things she attempted to hold. Plaintiff stated she could not cut meat with eating utensils; she had to "tear it with [her] fingers" because she lacked hand strength (R. 45).

As noted by Plaintiff in her brief, the Defendant did not address, in his Memorandum in Support of His Motion for Summary Judgment, the ALJ's analysis and decision as to Plaintiff's hand and shoulder limitations. Even if Defendant had argued that those limitations were not disabling or severe, the evidence indicates that they are medically determinable. S.S.R. 96-3p provides a distinction between what is a severe impairment and what is a medically determinable impairment.

> To be found disabled, an individual must have a medically determinable "severe" physical or mental impairment or combination of impairments that meets the duration requirement. At step 2 of the sequential evaluation process, an impairment

or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do work activities.

As medically determinable impairments, the ALJ was required to consider them throughout the decision. The Regulations require that if a severe impairment exists, then all medically determinable impairments must be considered in the remaining steps of the sequential analysis. See 42 U.S.C. §§ 423(d)(2)(B) and 1382(c)(a)(3)(F), *supra*. See also 20 C.F.R. §404.1523

The ALJ made did not consider, analyze, or weigh the evidence of record relative to Plaintiff's alleged and diagnosed hand and shoulder pain and limitations throughout his determination, either separately or in combination with her severe impairments.

The undersigned, therefore, finds substantial evidence does not support the ALJ's decision as it does not address Plaintiff's hand and shoulder pain and resulting limitations, if any.

As with Plaintiff's hand and shoulder limitations, the ALJ did not consider the effects of Plaintiff's diabetes, either separately or in combination with her other severe impairments. The ALJ discounted the effects of Plaintiff's ability to function due to diabetes because he found she was noncompliant with her medication and had no end organ damage (R. 21).

In his decision, the ALJ discussed Plaintiff's testimony at the administrative hearing, which was that she never knew when her "sugar [would] drop" and that she took four shots and one pill daily to treat her diabetes (R. 25). The ALJ noted that Plaintiff had informed Dr. Beard, in October, 2006, that she had not used any prescription medications for three years because she could not afford them. The ALJ also noted that Plaintiff, in January, 2007, in connection with her being evaluated by Dr. Sharp to receive a medical card, told the doctor that she had not been checking her blood

sugar. At that appointment, Plaintiff was prescribed medication to treat her diabetes (R. 26). The ALJ noted that Plaintiff told Dr. Sharp, in April, 2007, that her blood sugar was averaging 278; she told him, in August, 2007, that her home-glucose readings had averaged 183, but that she was experiencing blurred vision, increased fatigue, excessive thirst, and numbness/tingling in her feet and hands. The ALJ noted Plaintiff had been hospitalized for four days in August, 2007, due to a "diabetic coma/trauma" (R. 27).

The evidence of record contains additional information as to Plaintiff's treatment for diabetes. She was placed on sliding scale insulin in September, 2004 (R. 221). Her December, 2004, laboratory results showed her blood sugar to be "quite high," which indicated "poor control of diabetes (R. 227). In August, 2006, Dr. Pavlovich found Plaintiff's diabetes was under poor control because she was "noncompliant with medication and care." At that time, she was treating her diabetes with diet and herbal remedies. Dr. Pavlovich prescribed an insulin sliding scale and low dose Amaryl (R. 245). In October, 2006, Plaintiff informed Ms. Wagner that she did not take prescribed medications because she was "unable to afford" them (R. 257). Also in October, 2006, Plaintiff reported to Dr. Beard that she had not medicated her diabetes for three years because she could not afford the cost of the medicine (R. 263). In January, 2007, Plaintiff informed Dr. Sharp that she hand not checked her blood sugar or treated her diabetes in the past because she could not afford the medication (R. 514). Dr. Sharp prescribed medicine to treat Plaintiff's diabetes (R. 515). In March, 2007, Plaintiff was instructed, during a hospitalization for a urinary tract infection and aseptic meningitis, to use a glucometer to check her blood sugar four times per day (R. 368). When Plaintiff returned to Dr. Sharp in April, 2007, she reported that her blood glucose home readings averaged 278. In August, 2007, Plaintiff informed Dr. Sharp that she had "been checking her sugar

. . . and [it] [had] been good." She also reported to Dr. Sharp that she had been managing her diabetes with oral medications, insulin, and finger-stick testing. Dr. Sharp expressly found she had been taking her diabetes medications and had been checking her blood sugar at home (R. 517).

As noted above, Plaintiff was not compliant with her treatment of her diabetes with the prescribed medicines for several years. It was not until January, 2007, that she began medicating her diabetes with the drugs prescribed by Dr. Sharp and with insulin. The reason Plaintiff was non-compliant with the prescribed medical treatment for treatment of her diabetes was that she was unable to afford medication; it was in 2007 that she was awarded a medical card and could pay for prescription medications.

The Fourth Circuit held, in *Lovejoy v. Heckler*, 790 F.2d, 1114, 1117, the following:

> A claimant may not be penalized for failing to seek treatment she cannot afford; "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984). . . . [I]t is as erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed treatment when that failure is justified by lack of funds. *Cf. Preston v. Heckler,* 769 F.2d 988 (4th Cir.1985).

Plaintiff, in the instant case, informed the doctors who treated her and testified at the administrative hearing that she failed to medicate her diabetes as prescribed because she could not afford the medication. Once Plaintiff was awarded a medical card, she routinely checked her blood sugar at home and she took her medications. When she reported her blood sugar levels to Dr. Sharp in April and August, 2007, she reported the average levels from her home testing. In August, 2007, she informed Dr. Sharp that she had been taking her medicine and was "check[ing] her sugar at home" (R. 517). Still, Dr. Sharp found her blood sugar was sub-optimally controlled (R. 511, 517).

At the administrative hearing, Plaintiff informed the ALJ that she administered "four shots a day plus one pill" to treat her diabetes (R. 51). Plaintiff testified she "tr[ied] to eat right" and to "drink diabetic beverages" to control her diabetes (R. 51-52). Plaintiff testified she monitored her blood sugar "about four times a day" (R. 52). The evidence of record shows that Plaintiff treated her diabetes as prescribed when she could afford to purchase the medications and supplies.

S.S.R. 82-59 explains the Social Security's evaluation criteria for failure to follow prescribed treatment as follows:

> SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:
>
> > 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . .; and
> >
> > 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
> >
> > 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
> >
> > 4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

All of the above listed conditions did not exist in the instant case. The ALJ did not find, based on his assessment of the evidence, that Plaintiff's impairment precluded her from engaging in substantial gainful activity.

Additionally, it was not clear that treatment of Plaintiff's diabetes would "restore [her] capacity to engage in any SGA." The record showed that Plaintiff's diabetes was uncontrolled. Indeed, after Plaintiff started medicating and monitoring her diabetes, she was hospitalized for diabetic coma/trauma (R. 27). Plaintiff informed Dr. Sharp that she experienced limitations due to

her diabetes in the form of blurred vision, increased fatigue, excessive thirst, and numbness/tingling in her feet and hands (R. 27). She testified that her diabetes caused her blood sugar to fluctuate, which caused her to panic (R. 52).

Additionally, Plaintiff did not refuse to treat her diabetes with prescribed medication. Prior to January, 2007, Plaintiff did not purchase the medications to treat her diabetes, or any prescription medication for that matter, because she lacked the funds to do so.

The undersigned finds substantial evidence does not support the ALJ's decision that Plaintiff was non-compliant with her prescribed diabetes medications because she did not take them on a regular basis.

Plaintiff asserts that the ALJ erred in finding Plaintiff's mental impairments were non-severe because he found that Plaintiff would have received treatment from a mental health professional and would have taken prescription drugs for her mental impairments if they were debilitating (Plaintiff brief at p. 12). The Defendant contends that since Plaintiff's "emotional symptoms were capable of effective medical management with medication," the ALJ did not err (R. Defendant's brief at p. 12).

As noted above, the ALJ found that Plaintiff's mental impairments were non-severe because she had not received any medical treatment and was non-compliant with her medication. He found that "if she were suffering from debilitating mental impairments, she would have received some treatment from a mental health professional and would be taking prescription medications" (R. 22).

Also as noted above, Plaintiff reported being non-compliant with taking her prescription medication for a period of time due to her not being able to afford those medications. In January, 2007, she received a medical card and she began taking her medications as prescribed (R. 257, 514).

The record contains evidence from Dr. Sharp that he prescribed medications to treat Plaintiff's mental impairments. On January 15, 2007, Plaintiff reported to Dr. Sharp that she was feeling "anxious, irritable" and was experiencing sleep disturbances (R. 514). Dr. Sharp prescribed Paxil (R. 515). On April 30, 2007, Plaintiff returned to Dr. Sharp, who found Plaintiff was anxious, had depressed affect, was hyperactive, had mood swings, was agitated, was paranoid, and had poor insight. He opined her depressive symptoms were chronic. Dr. Sharp renewed Plaintiff's prescription for Paxil (R. 512). On August 3, 2007, Plaintiff was again diagnosed with chronic depression by Dr. Sharp and, in addition to renewing Plaintiff's prescription for Paxil, he prescribed Buspirone (R. 519-20). Dr. Sharp did not make an entry in his treatment notes that Plaintiff had been non-compliant with taking her prescribed medication for her depression/anxiety symptoms. The ALJ, nonetheless, made his finding that Plaintiff was non-compliant because Plaintiff informed Ms. Rose, in September, 2007, that she had been prescribed "nerve pills" but had not had the prescription filled (R. 22). Ms. Rose listed, however, that Plaintiff was medicating with Buspirone (R. 529). The ALJ did not consider, however, that, at the administrative hearing, Plaintiff testified that she treated her panic attacks by taking a "nerve pill" and going "to sleep" (R. 49). According to that testimony, Plaintiff had gotten the prescription(s) for her depression/anxiety medications filled and had taken them. The ALJ did not question Plaintiff about her compliance.

As to Plaintiff's not having sought treatment for her mental impairments, the record contains no evidence that any such treatment was prescribed. Even though Plaintiff's treating physician was prescribing medications to treat Plaintiff's depressed mood, anxiety, mood swings, and agitation, he did not refer her for mental health counseling as treatment of those symptoms. On October 2, 2006, Ms. Wagner diagnosed Plaintiff with depressive disorder, panic disorder without agoraphobia,

and generalized anxiety disorder and found that Plaintiff's prognosis was "fair with appropriate medical and psychological intervention" (R. 258, 259). No physician who was treating Plaintiff at that time acted on this recommendation. Additionally, Ms. Rose suggested Plaintiff should be treated for chronic post traumatic stress disorder and severe depressive disorder. In her findings, Ms. Rose opined Plaintiff was "in need of treatment" (R. 530). Ms. Rose made that finding on September 25, 2007, just a few days before the October 4, 2007, administrative hearing. It is, therefore, unknown if Plaintiff has sought treatment for her mental impairments as per Ms.Rose's recommendations.

There is no evidence in the record to support Defendant's assertion that Plaintiff's "emotional symptoms were capable of effective medical management with medication" (Defendant's brief at p.12). Dr. Sharp did not find that Plaintiff's mental health impairments could be effectively managed through her use of medication; neither Ms. Wagner nor Ms. Rose expressed such an opinion. Both Ms. Wagner and Ms. Rose found severe mental impairments. Ms. Wagner diagnosed depressive disorder, panic disorder, and GAD; Ms. Rose diagnosed P.T.S.D. and found Plaintiff's depressive disorder was severe and recurrent (R. 258, 530). Even though both psychologists found Plaintiff should be treated for her mental conditions, neither psychologist opined that treatment with medication would alleviate the symptoms. Ms. Rose actually found Plaintiff's prognosis was "poor" (R. 530).

The undersigned, therefore, finds the ALJ's decision that Plaintiff's mental health impairments were non-severe because she was non-compliant with taking her medications and because she did not receive any treatment for her symptoms is not supported by substantial evidence.

## E.  Evidence outside Record

Plaintiff has alleged that the ALJ relied on evidence outside the record to discredit the opinion of the treating physician.  The Defendant contends the ALJ did not rely upon evidence outside the record to discredit the opinion of the treating physician.

In his decision, the ALJ made the following finding as to the opinions of Dr. Sharp, Plaintiff's treating physician:

> As for the opinion evidence, the undersigned has considered the opinion of Dr. Sharp, the claimant's primary care physician, who opined that the claimant's impairments meet a listing and that the claimant is incapable of even low stress jobs, can lift and carry less than 10 pounds occasionally, can walk ½ a block, can stand less than 2 hours in an 8 hour day, can sit for 2-4 hours in an 8 hour day, would need to shift positions at will and lay down every 60 minutes for 10 minutes at a time (Exhibits 21F, 27F).  The undersigned rejects these conclusory opinions as they are not supported by the longitudinal record with its routine and conservative treatment, including Dr. Sharp's own treatment notes, which reveal that he has only see the claimant on three occasions since November 1996, starting in January 2007 (Exhibits 25F & 26F), and he assumed an advocacy role right from the start, as well as the fact that no other treating sources/specialists have suggested that the claimant  cannot work and the fact that the claimant has been engaging in work-like activities of caring for her father, which the vocational expert classified as light to medium in exertion (R. 28-29).

In addition to the above finding, the ALJ inserted a footnote at midpoint in the first sentence of this finding.  It read:

> Dr. Sharp was being less than forthright when he said in Exhibit 27F that he had been seeing the claimant for years every 2-3 months when his treatment notes reflect that he had not seen the claimant since November 1996 until January 2007 (R. Exhibits 25F/6-7).  *Moreover*, it was reported in the July 27, 2007 Charleston Gazette (http://sundaygazettemail.com/webtools/ring/News/200707268):
>
> **Doctor accused of defrauding government programs of $570,000**
>
> By The Associated Press
>
> ELKINS – A doctor is accused of obtaining more than $570,000 from federal and state health care programs through a fraudulent billing scheme.
>
> A federal grand jury in Elkins indicted Dr. John C. Sharp, 67, last week on 30 counts

of defrauding Medicare, Medicaid and the state's Workers' Compensation system between May 1998 and January 2006.

Sharp, an osteopath, operates Pocahontas County Medical Clinic, which has facilities in Marlington and Green Bank.

Sharp is charged with 10 counts of falsifying the times of office visits with patients so that he could claim reimbursements at higher rates for longer visits. He also is charged with failing to document the visits' times.

He allegedly obtained $258,491.40 from Medicare, Medicaid and the Workers' Compensation system through this scheme.

Another 10 counts allege that Sharp submitted claims for office visit services that were higher than what was actually provided to patients. Medicare and Medicaid paid a total of $311, 943.06 for these claims.

Sharp also faces 10 counts of submitting claims for office visits that never occurred.

The frequency of the claims significantly exceeded the frequency of similar claims submitted by other doctors, the indictment said.

Sharp is scheduled to be arraigned on August 7 (emphasis added) (R. 28).

It is clear, from the language contained in the footnote, that the ALJ based his assessment of Dr. Sharp's truthfulness in formulating and expressing his opinions as to Plaintiff's limitations by considering, in part, information found in an article that appeared in the July 27, 2007, edition of the *Charleston Gazette*. Additionally, at the administrative hearing, the ALJ was aware of the indictment against Dr. Sharp, and stated that he "under[stood] that Dr. Sharp ha[d] . . . legal problems" (R. 68).

The Fourth Circuit has held that "[a] factual finding by an ALJ is not binding if it was reached by means of improper standard or misapplication of law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980; *Williams v. Ribicoff*, 323 F.2d 231, 232 (5th Cir. 1963); *Tyler v. Weinberger*; 409 F.Supp. 776, 785 (E.D.Va.1976)." *Coffman, supra*, at 517. It was improper for the ALJ in the

instant case to consider the newspaper article about federal criminal charges pending against Dr.

Sharp.  The evidence the Commissioner may consider is set out in 20 C.F.R. 404.1529, which

provides, in part, the following:

> (a) *General.* In determining whether you are disabled, we consider all your
> symptoms, including pain, and the extent to which your symptoms can reasonably
> be accepted as consistent with the objective medical evidence and other evidence.
> By objective medical evidence, we mean medical signs and laboratory findings as
> defined in §404.1528 (b) and (c). By other evidence, we mean the kinds of evidence
> described in §§404.1512(b)(2) through (6) and §§404.1513(b)(1), (4), and (5), and
> (d). These include statements or reports from you, your treating or nontreating
> source, and others about your medical history, diagnosis, prescribed treatment, daily
> activities, efforts to work, and any other evidence showing how your impairment(s)
> and any related symptoms affect your ability to work. We will consider all of your
> statements about your symptoms, such as pain, and any description you, your treating
> source or nontreating source, or other persons may provide about how the symptoms
> affect your activities of daily living and your ability to work. However, statements
> about your pain or other symptoms will not alone establish that you are disabled;
> there must be medical signs and laboratory findings which show that you have a
> medical impairment(s) which could reasonably be expected to produce the pain or
> other symptoms alleged and which, when considered with all of the other evidence
> (including statements about the intensity and persistence of your pain or other
> symptoms which may reasonably be accepted as consistent with the medical signs
> and laboratory findings), would lead to a conclusion that you are disabled. In
> evaluating the intensity and persistence of your symptoms, including pain, we will
> consider all of the available evidence, including your medical history, the medical
> signs and laboratory findings and statements about how your symptoms affect you.
> (Section 404.1527 explains how we consider opinions of your treating source and
> other medical opinions on the existence and severity of your symptoms, such as
> pain.) We will then determine the extent to which your alleged functional limitations
> and restrictions due to pain or other symptoms can reasonably be accepted as
> consistent with the medical signs and laboratory findings and other evidence to
> decide how your symptoms affect your ability to work.

Information that is not part of the formal record, such as information contained in articles

discovered in a newspaper, is not evidence.  As to the analysis of the opinions of a treating

physician, the Fourth Circuit has mandated that the "'[a]ttending physicians rule' requires that

opinion of disability claimant's treating physician be given great weight and may be disregarded

only if there is persuasive contradictory evidence." *Coffman*, *supra*, at 514, 517-18. The *Charleston Gazette* newspaper article, considered by the ALJ, is not evidence. It is certainly not "contradictory evidence" of a medical nature. As noted above, the ALJ, in his discussion of the opinions of Dr. Sharp, noted that Dr. Sharp's finding that Plaintiff met a listing was not "supported by the longitudinal record with its routine and conservative treatment . . . as well as the fact that no other treating sources/specialists have suggested that the claimant cannot work and the fact that the claimant has been engaging in work-like activities of caring for her father, which the vocational expert classified as light to medium in exertion" (R. 29). The findings of the ALJ may point to contradictory evidence between Dr. Sharp's opinions and other objective evidence of record; however, the fact that the ALJ also included and considered evidence outside the record in his decision to disregard the opinions of Dr. Sharp was inappropriate. Even though Defendant, in his brief, asserted that the ALJ "provided sufficient and legitimate reasons for not crediting Dr. Sharp's physical restrictions," he also acknowledged that the ALJ did consider the information contained in the newspaper article. He wrote that "Dr. Sharp's indictment was not the only reason given by the ALJ for discounting his [Dr. Sharp's] opinion" (Defendant's brief at pp. 13-14).

For the above stated reasons, the undersigned finds that the ALJ's decision to reject the opinions of Dr. Sharp is not supported by substantial evidence.

### F. VE/Incomplete Hypothetical

Plaintiff contends the Commissioner erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question. Defendant asserts that the ALJ's hypothetical question was appropriate. In *Walker v. Bowen*, 876 F.2d 1097, 1101 (1989), the Fourth Circuit held:

> For vocational expert's opinion to be relevant or helpful in disability benefits
> proceeding, it must be based upon consideration of all other evidence in record and

must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.

Because the undersigned has already found that the ALJ did not evaluate or consider Plaintiff's rheumatoid arthritis; that his determinations as to Plaintiff's diabetes, mental impairments, and hand and shoulder conditions were not supported by substantial evidence; and that he relied on evidence outside the record to reject, in part, the opinions of Plaintiff's treating physician, it follows that his reliance on the VE's responses to his hypothetical questions is also not supported by substantial evidence.

## VI.  RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI.  I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Judgment on the Pleadings be **GRANTED** and this action be **REMANDED** to the Commissioner  for further action in accordance with this Report and Recommendation/Opinion.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley,  United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 22nd day of June, 2009.


/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE